## No. 23392.

WILLIAM G. WIGINGTON AND RUBY BELL, ADMINISTRATORS OF THE ESTATE OF ANNA WIGINGTON, DECEASED; AND W. E. BRENTON AND LOIS PONSFORD, CONSERVATORS OF THE ESTATE OF HAROLD LANZENDORFER, MENTAL INCOMPETENT V. STATE HOME AND TRAINING SCHOOL, GRAND JUNCTION, COLORADO, CLAIMANT; AND COLORADO STATE HOSPITAL, CLAIMANT.

(486 P.2d 417)

' Decided June 21, 1971.

160

WM. ATHA MASON, ROGER D. BORLAND, for plaintiffs in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE,

Deputy, RICHARD ROBB, Assistant, HAROLD A. FEDER, Special Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

REPRESENTATIVES of two estates are here as plaintiffs in error. Involved are a claim of the State Home and Training School at Grand Junction, Colorado (called State Home) against the Wigington estate and a claim of the Colorado State Hospital (called State Hospital) against the Lanzendorfer estate. The claims were consolidated for hearing in the district court, and after each was allowed, a single writ of error was sued out from the two determinations of the trial court. The principal argument of the representatives of the estates is that certain statutes are unconstitutional. Two other assignments of error, which are without merit, also have been presented and will be mentioned briefly later. We affirm as to the constitutional questions; and as to the Lanzendorfer estate we affirm as to all particulars. By reason of matters apparently not considered — or at least not seriously considered — by both the trial court and counsel on both sides, we must reverse and remand as to the claim against the Wigington estate.

## LANZENDORFER ESTATE

In 1954 Lanzendorfer was adjudicated a mental incompetent and committed to the State Hospital. He was discharged from the hospital on September 29, 1964. From the time of his commitment until May 1, 1964, the charges for which his estate was billed by the State Hospital were fixed under the authority of C.R.S. 1963, 71-1-16 and 17, which are referred to as the older statute. On May 1, 1964, 1965 Perm. Supp., C.R.S. 1963, 71-7-1 *et seq.* became effective. This enactment, referred to as the newer statute, repealed the older statute.

Under the older statute the estate of a committed

person was made liable for the claims of the State Hospital for care and maintenance "equal to the cost per capita per month of care and treatment of other patients in said institution." The statute provides for collection of claims to be made under actions instituted and prosecuted by the attorney general.

The newer statute provides that, when any mentally ill or mentally deficient person is committed to any public institution supervised by the department of institutions, there "shall be assessed against the said person or his relatives . . . all or such part of such cost as they are respectively able to pay . . ." The newer statute further provides that the department of institutions shall determine the ability to pay by consideration of net taxable income, age, number of dependents and their ages, mental and physical condition, length of care and treatment, assets and liabilities. The determination is to be made according to schedules contained in published rules adopted in accordance with the provisions of the Colorado Administrative Code (C.R.S. 1963, 3-16-1 *et seq.*) The statute provides for appeals to a court of record.

Until the end of 1964 the State Hospital billed the Lanzendorfer estate for a monthly charge of $95, the maximum charge during the period, and the conservators paid these charges. On January 1, 1964, the charge was increased to $258 a month, which the department of institutions had set as the new maximum charge. After the newer statute became effective, it was determined that under its provisions the estate was able to pay this amount, based on available assets of a value of $21,427.52. The conservators made one payment of $258 and then, as the smiles of *My Last Duchess,* there were no more payments.

I.

■ The Lanzendorfer estate argues that both the older statute and the newer statute are violative of Colo. Const., art. II, §5, which reads, "No person shall be deprived of life, liberty, or property, without due process

of law." No authority has been cited to us which holds that a similar statute is unconstitutional as violative of due process. In addition to indulging in the presumption of constitutionality until demonstrated otherwise, the Attorney General has cited *Beach v. Government of District of Columbia,* 320 F.2d 790 (1963), which is authority for the proposition that the statutes under consideration do not violate constitutional "due process." In addition, while not directly in point, we find an inference in *Colorado v. Estate of Burnell,* 165 Colo. 205, 439 P.2d 38 (1968), and in *Estate of Randall v. Colorado State Hospital,* 166 Colo. 1, 441 P.2d 153 (1968), that these statutes comport with necessary due process.

Our determination as to due process is limited to the statute subjecting the assets of the Lanzendorfer estate to payment for care at the State Hospital. We do not consider due process under C.R.S. 1963, 71-1-15, which provided for a determination by the county judge of the ability of relatives or next of kin of the committed person to pay for his or her care. As will be seen later we do not regard this as a proper issue in the Wigington estate. Hence, *Board of Administration v. Miles,* 278 Ill. 174, 115 N.E. 841 (1917), which has been cited, is not applicable.

II.

■ Another argument presented is that the statutes violate the equal protection provisions of the Fourteenth Amendment. The cases cited by the estates, which involve liability for institutional care, all concern the responsibility of *relatives* of the inmate and none involve liability of the inmate himself or his estate. Accordingly, we are unable to see any equal protection problem with respect to the assets of Lanzendorfer, the person confined. Upon further hearing in the Wigington estate, the administrators may wish to raise this, as well as other, constitutional questions.

III.

■ A further constitutional argument is that the

statutes violate Colo. Const., art. VIII, §1 which provides that certain institutions, including those for the benefit of the insane, "shall be established and supported by the state, in such manner as may be prescribed by law." Also cited is the provision of C.R.S. 1963, 71-3-3 which states that all persons adjudged to be insane "are hereby made wards of the state of Colorado." Under the authority of *Board of Comm'rs. v. State,* 122 Okla. 268, 254 P. 710 (1927), it is argued that by virtue of the constitutional provision the state must pay all the expense of the care of its wards as defined by the statute just mentioned, and that it cannot charge the estate of the ward nor its relatives for such care. We prefer rather to follow the contrary view of *State v. Glenn,* 60 Ariz. 22, 131 P.2d 363 (1942); and *State v. Johnson,* 50 Idaho 363, 296 P.588 (1931). We hold that this constitutional provision does not prevent collection for expenses of care.

IV.

█ The Lanzendorfer estate argues that the statutes are unconstitutional as being violative of Colo. Const., art. II, §3 (relating to inalienable rights) and art. V, §25 (special legislation). We find no merit in these arguments.

V.

█ The Lanzendorfer estate sought to introduce in evidence a letter from the State Hospital to counsel for the estate dated September 15, 1964. This letter set forth the objection of the estate to payment of the amount claimed by the State Hospital; that nursing home care would be adequate and cheaper for the incompetent; that he desired to be in a nursing home in Grand Junction, Colorado; and that, unless the conservators of the estate selected a home to which he would go, the State Hospital would select one and send him to it. The court refused to admit the letter in evidence. The state claimed this was error as the letter shows an unreasonable and arbitrary act of the State Hospital resulting from the conservators' refusal to pay the higher charge for care.

We fail to see how the letter has any bearing upon the validity of the statutes or upon the liability of the estate for care and treatment while Lanzendorfer was in the State Hospital.

## VI.

As to both the Lanzendorfer and Wigington estates, counsel makes the broad and bold assertion that the allowance of the claims by the trial court resulted in great injustice to the estates. The only argument made under this assertion is the statement that, since Mrs. Wigington was not charged for the support of her son during his lifetime, the estate should not be charged, citing *State v. Panzeri,* 76 Idaho 211, 280 P.2d 1064 (1955). We are not going to search for arguments supporting the "great injustice" when the estates do not favor us with any. As to the proposition for which *Panzeri* was cited, we will comment later in this opinion.

## WIGINGTON ESTATE

In 1933, when Henry Wigington was about 15 years of age, he was placed in the State Home and, so far as the record discloses, he is still there. Anna Wigington was Henry's mother. She died intestate on October 9, 1963, leaving six children, including Henry. According to the inventory filed in her estate, her assets were of a value of $6,207 prior to the payment of any claims.

After modification of the State Home's claim during the hearing, it claimed $8,214 for care and treatment of Henry for the period from October 31, 1952 until April 30, 1964. Somewhat anomalously, neither court nor counsel appeared to notice that this bill included care and treatment for the six month's period following the death of Anna Wigington. We are at a loss to know how there could be a liability upon the estate of the mother for the period following her death.

The ledger sheets of the State Home for care and treatment of Henry showed Anna Wigington as his mother, and also disclosed the monthly charges and balances

carried forward. All of the ledger sheets bear the nota-tion, "No Bill." In apparent contrast, the senior accoun-tant of the State Home testified that monthly billings were sent to Mrs. Wigington.

At the hearing counsel for the State Home announced that the claim against the Wigington estate was made under the older statute and the newer statue, i.e., C.R.S. 1963, 71-1-15 through 17 and 71-7-1 *et seq.*[1] Throughout, court and counsel tried and determined this case on the basis of the older and newer statutes. The constitutional questions were urged jointly and equally as to the two estates, both in the trial court and here. While the trial court entered separate orders of allowance of the claims in the two estates, its finding as to constitutionality in each of these orders are practically identical.

■ Unless our thoughts are misdirected, neither the older statute nor the newer statute has any applicability to the Wigington estate. The liability of a relative is pro-vided only in §15 of the older statute and this section clearly relates only to costs at the State Hospital. We are unable to see how any claim on behalf of the State Home could be made under this statute. The newer statute was adopted the year following the death of Anna Wigington and we are at a loss to see how it can have any bearing on the matter.

■ Near the end of the attorney general's brief there is a casual reference to C.R.S. 1963, 71-4-5, which does relate to the State Home. Except for this and the mention in oral argument that this section of the statute was amended in 1964, we find no other reference in the briefs and recall no further comment in oral argument concern-ing section 71-4-5. This statute was adopted in 1909 (L.09, p.182) and amended in 1947 (L.47, p.61). It re-mained in a form as amended in 1947 until it was repealed and reenacted by the newer statute in 1964 (L.64, p.492).

Section 71-4-5 provided that, when any person admitted to the State Home or his parents "are able to pay the

[1] From this point forward §15 is included in the term "older statute."

whole of the maintenance of such person, such payment shall be required of such person or parents, as the case may be." It further provides that if such maintenance cannot be paid in full the superintendent of the State Home may cause an investigation to be made by the County Department of Public Welfare in the county where the person resided, and the person or the parents, as the case may be shall pay such part of the maintenance as the Welfare Department's report indicates they are able to pay.

The record does not disclose whether any investigation was made under the statute last discussed. The senior accountant of the State Home testified as follows:
"The first time that we tried to find out whether the parents [of Henry] had the ability to pay was for the year 1959. And at that time, why they proved that they had no ability to pay the charge."
We have been unable to find any reference in the record to Henry's father. The listing of Mrs. Anna Wigington as the only parent on the State Home's ledger sheet might indicate that she was the only parent to whom the State Home might look for reimbursement. We assume that Henry himself had no assets.

The record and briefs leave us nearly in a complete vacuum as to the following questions:
1. During the period prior to any investigation of Mrs. Wigington's ability to pay under Section 71-4-5, is the allowance of a claim against her estate for care and support during that period dependent upon a showing that she was able to pay during the period?
2. If the investigation made in 1959 was made and reported under the provisions of 71-4-5 with a finding that Mrs. Wigington had no ability to pay, is her estate liable for care and support during the time embraced within the report of inability?
Possibly, there may be involved the question whether, irrespective of ability to pay, a claim can be allowed against a decedent's estate under the provisions of 71-4-5.

Also, the Attorney General has made reference to C.R.S. 1963, 43-3-1, which makes a parent liable for support of a child. We have been cited no authority as to whether Henry was a "child" after he passed his 21st birthday, which was prior to the period embraced within the claim made in this estate.

We bow to the right of the trial court and counsel to give consideration to the answers to these problems before we do so.

The Judgment is affirmed as to the claim allowed in the Lanzendorfer estate, and in the Wigington estate the order of the trial court is reversed and the cause is remanded for a new hearing with directions to determine the applicability of C.R.S. 1963, 71-4-5, both factually and in law, to the claim of the State Home.